### NEW YORK, N. H. & H. R. CO. et al. v. PULLMAN CO.

(District Court, D. Connecticut. June 1, 1925.)

No. 2391.

1. **Specific performance ⬅⇒17—Corporation not party to contract held not entitled to enforce specific performance.**

A contract between a railroad company and the Pullman Company for the operation of Pullman cars over the owned, leased, or controlled lines of the railroad company held not to make the corporation owning one of the controlled lines a party, so as to entitle it to maintain a suit for specific performance.

2. **Railroads ⬅⇒138—Contract between railroad company and Pullman Company construed.**

A contract between a railroad company and the Pullman Company respecting the use of Pullman cars on the lines of railroad owned, leased, or controlled by the railroad company held intended to apply to the physical lines of railroad, the operation of which was controlled by the railroad company, and when it ceased to control operation of a line the contract held to become inoperative as to that line, while, on the other hand, it became applicable to any additional line of which the railroad company acquired operative control.

In Equity. Suit by the New York, New Haven & Hartford Railroad Company and others against the Pullman Company. On motion to dismiss bill. Granted.

George D. Watrous, of New Haven, Conn. (Watrous, Day, Hewitt, Steele & Sheldon, of New Haven, Conn., and Moorfield Storey, of Boston, Mass., on the brief), for plaintiffs.

Arthur M. Marsh, of Bridgeport, Conn. (Marsh, Stoddard & Day, of Bridgeport, Conn., on the brief), for defendant.

THOMAS, District Judge. This bill in equity was brought to compel the specific performance of a certain contract made and entered into between New York, New Haven & Hartford Railroad Company, plaintiff, and the Pullman Company, defendant. Subsequently, and upon motion granted, the bill was amended. The defendant has filed a motion to dismiss the bill as amended for insufficiency, and it is this motion that is now before the court.

The suit was originally brought in behalf of the New York, New Haven & Hartford Railroad Company, the Boston & Maine Railroad Company, and the Maine Central Railroad Company, but by consent of all parties the Boston & Maine withdrew as a party plaintiff. In their bill the plaintiffs allege the execution of a contract for a term of 20 years between the New York, New Haven & Hartford Railroad Company and the Pullman Company, which was effective on the 31st day of December, 1912. The contract provided generally for the use of Pullman cars upon the lines of the New York, New Haven & Hartford Railroad Company. Paragraph 1, which is the basis for this controversy, provides:

"(1) For the purposes of this agreement the railroad company's lines shall be understood to be all lines of railroad now or hereafter owned by the railroad company or controlled by it through lease, stock ownership or otherwise. During the term of this agreement, all cars which the railroad company or any one of its controlled companies shall desire to run on any of the railroad company's lines in which, in addition to the regular passenger fare, a fare is to be charged for the the special accommodations afforded by said cars, shall, except as hereinafter provided, be cars provided by the Pullman Company in accordance with and subject to the provisions of this agreement, for such use as the railroad company or such controlled companies may from time to time desire to make of them: Provided, however, and it is expressly understood, that the terms and provisions of this agreement shall not apply to the lines of the Boston & Maine Railroad or to the lines of the Maine Central Railroad Company until the end of the term of the now existing contracts between the Pullman Company and Boston & Maine Railroad and Maine Central Railroad Company, respectively."

For the sake of brevity, the New York, New Haven & Hartford Railroad Company will hereafter be designated the "Railroad Company." The plaintiffs allege that the contract was made by the Railroad Company in its own behalf "and for the benefit, also, of the companies which it owned or controlled, including the plaintiffs," etc.

The bill further alleges that at the termination of the existing contracts between the Pullman Company and the Boston & Maine Railroad Company and the Maine Central Railroad Company, on or about March 25, 1918, the Railroad Company demanded that the defendant furnish to these two railroads the cars and accommodations provided for in the contract above recited, and that on that date the Railroad Company delivered to the defendant "agreements" duly executed by the Boston & Maine Railroad Company and the Maine Central Railroad Company, respectively, whereby the original agreement was ratified and confirmed. The defendant, however, has refused and still refuses to apply the terms of its contract with the Railroad Company to the lines of the Boston & Maine Railroad Company and the Maine Central Railroad Company. It is alleged that on the 31st day of December, 1912, the lines of the Boston & Maine Railroad Company and the Maine Central Railroad Company were controlled by the Railroad Company, through lease, stock ownership, or otherwise. It is not alleged that the Pullman Company has refused or refuses to fulfill the terms of its agreement in reference to the lines of the Railroad Company, nor is there any allegation that at this time the Railroad Company owns, operates, or controls the lines of either the Boston & Maine or the Maine Central Railroad Companies.

Under an order of this court directing the plaintiffs to file a more particular and specific statement of the allegations of the bill, the plaintiffs amplify their general allegation of stock control by averring that on the 31st day of December, 1912, the Railroad Company controlled the Boston Railroad Holding Company, a Massachusetts corporation, through the ownership of a majority of its stock. The Boston Railroad Holding Company controlled the Boston & Maine Railroad Company through ownership of a majority of its stock, and the Boston & Maine Railroad Company controlled the Maine Central Railroad Company through the ownership of a majority of its stock.

[1] The very first question which forces itself upon our attention is the status of the Maine Central Railroad Company as a party

plaintiff to this suit. It will be noted that the agreement upon which this action is based is under seal, and is one made between the Railroad Company and the Pullman Company. The Maine Central Railroad Company is not a party to the agreement, and is no privy thereto. The allegation in the bill that the contract was made by the Railroad Company in its own behalf, and also for the benefit of the companies which it owned or controlled, is not an adequate basis upon which the Maine Central Railroad Company may seek, by specific performance, or otherwise, to enforce the provisions of the contract. No mutuality of obligation exists as between the Pullman Company and the Maine Central Railroad Company.

The expressed willingness of the latter to be bound by the decree is no sufficient substitute for a cause of action, and if we go the full length of the plaintiff's contention, that the res upon which the agreement operated was not the physical properties and lines under the control of the Railroad Company, but was rather the corporate entities controlled through stock ownership, it must be obvious that, for the purpose of this agreement, the corporate entity known as the Maine Central Railroad Company was required to be regarded as a normal entity—a form through which the Railroad Company manifested its activities. If the Boston & Maine Railroad Company was intended to be considered as a corporate entity having a will of its own, an individuality of its own, a corporate purpose and destiny of its own, separate and distinct from that of the Railroad Company, then it is quite impossible to see what practical significance was intended to be placed upon the term "control," as indicative of the relations between the two corporations. I therefore hold that the bill presents no cause of action by the Maine Central Railroad Company against the defendant.

[2] What was the meaning and intent of the language of the first paragraph of the agreement between the Railroad Company and the defendant? The contentions of the respective parties are briefly as follows:

The plaintiff says that the agreement was intended to apply to any railroad company in which the New York, New Haven & Hartford Railroad Company controlled a majority of the stock, whether such control existed at the time of the making of the agreement or came into being at any future time. The Railroad Company further contends that, once such control existed, the provisions of the agreement would be applicable to said

controlled railroad for the full balance of the term thereof, wholly irrespective of the subsequent severance of relations between the two companies, the subsequent loss of control, or any other subsequent act or event.

The defendant urges that the res upon which the agreement was intended to operate was the physical properties in the possession or under the control of the Railroad Company; that it would be immaterial whether such control was exercised by reason of a lease or actual ownership, or because of the dominating influence of the Railroad Company in managing the destinies of another corporation; that the important thing was that the lines themselves should be under the control of the Railroad Company, regardless of the manner in which such control originated or was continued; and the defendant further contends that the agreement would be applicable to such lines only for the time within the term of the agreement during which such control continued to exist, that the moment such control ceased as to any line or lines then the agreement itself would cease as to such line or lines, that the moment it was acquired as to any line or lines it would attach to such line or lines and continue for the duration of such control.

It must be obvious that, if the defendant's contentions are valid, the present bill must be dismissed, because there is no allegation therein that, as to the lines of either of the other two corporations, the Railroad Company at this day exercises any control whatsoever. A textual analysis of the first paragraph of the contract yields a rather negative result. It is quite true that the language of the first sentence is: "The Railroad Company's lines shall be understood to be all *lines of railroads* now or hereafter owned by the Railroad Company or controlled by it through lease, stock ownership, or otherwise."

Standing by itself, this sentence would afford a fair basis for the conclusion that the res to which the agreement was intended to attach were the physical properties and not the corporate entities. The next sentence, however, blurs this impression, for it says: "During the term of this agreement all cars which the railroad company *or any one of its controlled companies shall desire to run* on any of the railroad company's lines * * * for such use as the railroad company or such controlled *companies* may from time to time desire to make of them."

This sentence prohibits the Railroad Company or any "companies" controlled by it from using parlor cars other than those fur-

nished by the Pullman Company. It does not confine this prohibition to the *lines* controlled by the Railroad Company. The gentlemen who formed this agreement were not meticulous in their use of language. We are therefore forced to examine the context in an endeavor to ascertain, if possible, the true intent and meaning of the language of paragraph 1. For such purpose, the preamble of an agreement is especially valuable. It is in the preamble that the parties attempt to elucidate the general purposes of the various stipulations about to be entered into. A part of this preamble reads:

"Whereas, the Pullman Company has contemporaneously herewith purchased from the Railroad Company all of said cars in view of the desire of the parties hereto to make a new arrangement for the furnishing for a period of twenty years by the Pullman Company of all the cars of such and similar classes *to be used on all of the railroad lines owned or controlled by the Railroad Company,* except as hereinafter excepted."

This language obviously supports the contention of the defendant that the purpose of the agreement was to provide for the conditions under which Pullman cars would be used on "railroad lines owned or controlled by the Railroad Company." It precedes the language of paragraph 1 and by an ordinary canon of construction it dominates that paragraph. Indeed, this contention would seem to provide a more practicable and reasonable basis for the relations of the parties than the one contended for by the plaintiffs. Stock control of a railroad corporation is quite a different thing from the operation and control of the railroad lines. Such control of a railroad corporation is frequently vested in financial holding companies that have no direct management of the railroad properties whatsoever. Contracts for the equipment, operation, and maintenance of such lines are not made with the holding companies, but rather are made with the corporations in actual operation.

There are numerous provisions in this agreement which could hardly have been carried out by the Railroad Company, except upon the theory of an intended actual operation of the lines. The Railroad Company, for instance, agrees to collect the Pullman fares under certain conditions. It has the right to designate the number and kinds and styles of cars which are to be provided by the Pullman Company. The Pullman Company must collect the fares from its passengers and turn the railroad fares over to the Railroad Company; its employees acting for

the purpose as the employees of the Railroad Company. Employees of the Pullman Company are to be subject to the regulations of the Railroad Company. They are to be removed at the request of the Railroad Company. Provisions of this kind obviously contemplate actual operation by the Railroad Company of the lines to which they apply.

I therefore conclude that the contract at bar was intended to be applicable to *lines of railroad* the operation of which was controlled by the Railroad Company. It might be that such operation or control was superinduced by stock ownership of another railroad company, but the main point always would be that, however induced or acquired, operation of the *lines* should constitute the necessary basis for attaching the provisions of the contract.

Now, the bill does allege that on December 31, 1912, the *lines* of railroad of the Boston & Maine Railroad Company and the Maine Central Railroad Companies were controlled by the plaintiff, the New York, New Haven & Hartford Railroad Company. I might have been constrained to regard this averment as the allegation of an ultimate fact, and not of a conclusion of law, were it not for the detailed statement of the nature of this alleged control of lines set out in the specific statement, which was filed pursuant to the order of court. When this allegation is read in the light of that detailed statement, then it becomes obvious that the pleader has averred his legal conclusions; that the simple fact was that a majority of the stock of the two other railroad companies was owned by an intervening corporation, in which the New York, New Haven & Hartford Railroad Company owned the majority of the stock. Reading all of the allegations together, I find no basis for the conclusion of the pleader that the *lines* of the Boston & Maine Railroad Company and the Maine Central Railroad Company were controlled by the plaintiff, the New York, New Haven & Hartford Railroad Company.

If, however, it be decreed that I am bound by the averment in the bill as an averment of an ultimate fact, the next question is: Is such averment sufficient for the purpose of this action? Not only is there no allegation that the lines of the Boston & Maine Railroad Company and the Maine Central Railroad Company are now controlled by the Railroad Company, but from the specific and detailed statement above referred to it affirmatively appears that such control ceased prior to the commencement of this action. The plaintiffs contend that such cessation of control does not affect their right to have the provisions of the contract applied to them. It seems to me that such contention opposes the spirit of the agreement and is contradicted by principles governing analogous situations.

I cannot escape the conviction that the contract in suit was intended to be applied to the property owned, leased, or operated by the Railroad Company, and that such application was to be flexible to the conditions as they were modified from time to time. In other words, if the Railroad Company acquired new properties during the term of the agreement, then its provisions would automatically attach to these new properties. The converse is equally true. If during the term of the contract the Railroad Company transferred or sold any of its properties to a stranger, then as to those properties the agreement would no longer be applicable nor enforceable at the suit of the Railroad Company. Possibly such stranger could assert a right to the same by way of an assignment from the Railroad Company. This question, however, is not involved in the present discussion.

It follows, therefore, that in the absence of an averment that the lines of the Boston & Maine Railroad Company and the Maine Central Railroad Company are now operated, managed, or controlled by the plaintiff, no action for the specific performance of this contract with reference to those lines inheres in the Railroad Company.

These conclusions, affirmatively deduced from the text of the agreement, are powerfully supported by the contemplation of the incongruous and impossible situation which would result from the adoption of the plaintiff's construction. If it was the intention of these parties to have the provisions of this contract applied to lines operated by separate and distinct railroad companies, at times when such railroad companies were no longer under the direction or control of the New York, New Haven & Hartford Railroad Company, then whoever drew this agreement must have been unfamiliar with practical affairs. In what manner, may we ask, could the Pullman Company, by an agreement with the Railroad Company, force its services upon an entirely different corporation in no way affiliated with it? The agreement was for a term of 20 years and it requires no extraordinary business acumen to visualize the possibility that before such period expired transportation conditions might be conceivably changed, and that what was at one time an excellent contract from the standpoint of

the Railroad Company might then be an onerous contract.

It is contended that the contract is an excellent one for the Railroad Company, and that its terms are less onerous than those exacted by the defendant from other railroad companies. But suppose that the facts had been different; suppose that the defendant was now offering terms to other railroads far better than those contained in this contract? The contention of the plaintiff requires us to conclude that under such conditions the Boston & Maine Railroad Company and the Maine Central Railroad Company would be compelled to accept Pullman service at the rates provided for in the contract with the New York, New Haven & Hartford Railroad Company, wholly regardless of the fact that at no time did either of these two companies enter into any contractual relations with the Pullman Company whatsoever. I am not prepared to assume that the direction of vast railroad interests was vested in hands that would work any such grotesque results.

In any event, I am unable to conceive upon what proper basis specific performance of this contract may be decreed at the instance of the Railroad Company for the benefit of the Boston & Maine Railroad Company and the Maine Central Railroad Company. It is true that the bill contains an averment, indiscriminately applied to all of the plaintiffs, that the refusal of the defendant to furnish the services in accordance with this contract has resulted in great damage to the plaintiffs and will continue to cause great damage. This scant allegation hardly meets the requirements of a bill in equity. What is the nature of the irreparable damage which the Railroad Company will suffer by reason of the refusal of the defendant to furnish its service to the Boston & Maine Railroad and the Maine Central Railroad Companies? Nothing appears on the face of the bill to support such an allegation. So far as the averments of the bill are concerned, it seems clear that this suit in behalf of the New York, New Haven & Hartford Railroad Company is purely academic. If irreparable damage is being done to the Railroad Company by reason of the refusal of the Pullman Company to supply Pullman cars to the other two railroad companies under the terms of the contract in suit, something more than an allegation of great damage must appear before it can be accepted as the predicate of a prayer for equitable relief. The New York, New Haven & Hartford Railroad Company concededly is getting all the Pullman service it needs. There may possibly be some interrelations between these companies which render it of vital importance to the New York, New Haven & Hartford Railroad Company to have the terms of this contract applied to the other two railroad companies; but, if such is the case, no suspicion of it appears in the pleadings.

I therefore conclude that the motion to dismiss the bill must be granted.

Decree accordingly.